### James McCullough, Appellee, v. Illinois Steel Company, Appellant.

### Gen. No. 5,118.

1. INSTRUCTIONS—*when not error to refuse.* If a verdict can be sustained upon the evidence upon any of the counts, then the refusal of the court to instruct the jury to find the defendant not guilty upon the particular counts and on the declaration as a whole, is harmless error.

2. MASTER AND SERVANT—*what risks not assumed.* Held, under the evidence, that an assistant master mechanic did not assume the risk of injury from the splashing of molten metal out of the nose of a mixer.

3. VERDICTS—*when not excessive.* Held, in an action on the case for personal injuries that a verdict for $18,000 was not excessive, where the evidence tended to show that at the time of the accident the plaintiff was a skilled mechanic, thirty-two years of age, in perfect health, and earning $135 per month, with an annual present from his employer of $100 at Christmas; was so efficient that he had the management of seventy mechanics under him; and where the evidence further tended to show that since the injury he has not been able to straighten his head, which, by the burning of

his head, neck and shoulders, was drawn back and to the right at an angle of fifty-five degrees, producing a wry neck and causing the plaintiff to look upwards and to the right constantly; that he became unable to lift his right hand as high as his shoulder; was burned so seriously that his life was despaired of for a time; that he suffered great pain and was incapacitated to follow his trade as a machinist in the future.

Action in case for personal injuries.  Appeal from the Circuit Court of Will county; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the October term, 1908.  Affirmed.  Opinion filed March 24, 1909.

GARNSEY & WOOD and WILLIAM BEYE, for appellant; KNAPP, HAYNIE & CAMPBELL, of counsel.

J. W. D'ARCY, for appellee.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

This is an action on the case brought by James McCullough, appellee, against the Illinois Steel Company, appellant, to recover damages for personal injuries sustained by him while employed in the company's mixer mill at Joliet, Illinois, which is one of the departments of the converter.

The original declaration contained four counts, and an additional count was afterwards filed.  The first count sets up the ownership of the plant and buildings, and charges the defendant with negligence in that it carelessly, negligently and wrongfully caused, permitted and allowed a large quantity of molten iron or other metal to escape or flow from a certain large vessel known as, to wit, a mixer, to and upon the plaintiff.  The negligence alleged in the third count is that the defendant carelessly and negligently overloaded the mixer and poured an unusually large amount of metal into it from a ladle, which was more than the mixer could hold with safety.  The fourth count alleges that the craneman operating the crane was an unskilled, incompetent and inexperienced servant, to wit: J. Juver, and that through his lack

of skill he caused a large quantity of molten iron to pass from the ladle into the mixer, which was more than the mixer could safely contain. Each count avers that the plaintiff was in the exercise of reasonable care, that he had no notice, knowledge or warning that the metal would escape from the mixer, and that the injury did not result from an assumed risk or the negligence of a fellow-servant. The trial court instructed the jury to find the defendant not guilty as to the second and additional counts. The case was submitted to the jury on the remaining counts, and a verdict of guilty was returned assessing the plaintiff's damages at $18,000. A motion for a new trial was overruled and a judgment entered on the verdict. The defendant brings the case to this court by appeal.

At the close of the evidence the appellant asked three instructions severally directing the jury to find the defendant not guilty as to the first, third, and fourth counts, and a fourth instruction to find the defendant not guilty. The court refused all these instructions, and the appellant assigns error upon the refusal of each of them. If a verdict can be sustained on the evidence upon any of the counts, then the refusal of the court to instruct the jury to find the defendant not guilty upon the particular counts and on the declaration as a whole, is harmless error, and it is unnecessary to discuss the application of the evidence to each count. Olson v. Kelly Coal Co., 236 Ill. 502; Swift & Co. v. Rutkowski, 182 Ill. 18; Consolidated Coal Co. of St. Louis v. Scheiber, 167 Ill. 539.

The evidence shows that in appellant's steel mills at Joliet there are several departments, each in charge of different men. On the 18th day of April, 1907, the appellee was a machinist and was the assistant master mechanic of the appellant in its Bessemer department. George Burgess was the general master mechanic under whom the appellee and the other assistant master mechanics worked. The appellee had charge of the repair of the machinery in the Bessemer department,

but had nothing to do with the operating of that department.   Herbert W. Spencer was the general superintendent and John D. Wombacher was the assistant superintendent of the Bessemer department and had general charge of the operating of that department.

Iron is converted into steel in the Bessemer department of appellant's mills.   The iron is brought from the blast furnaces into what is termed the mixer mill, and there combined with iron from other furnaces preparatory to its conversion into steel.   The mixer mill is a building constructed of iron or steel about 200 feet long east and west, about 70 feet in width and about 60 feet high.   The main floor is of concrete and is about fifteen feet above the ground level.   The east half of this building is occupied by two "mixers" which are large iron vessels shaped something like a gravy boat about twenty-five feet in length, about twenty feet in width and about fifteen feet in depth. They will each hold about two hundred and fifty tons of molten metal.   They are lined and covered on top with fire brick, the only openings being at the north end on the top where there is an aperture into which the metal is poured and at the south end where there is a nose or spout about four feet long and three feet wide.   The mixers stand side by side about twenty feet apart and are known as the east and west mixers.

A steel platform called the weigher's platform or mixer floor elevated about twelve feet above the main floor, extends along the south wall of the mill.   The north edge of this mixer floor extends a few feet north of the south end of the mixers; V-shaped notches are cut into the floor of the platform to make room for the nose or spout of the mixers which when level are about four feet above the mixer floor.   The mixers are placed upon rollers so that they can be tipped to the south to pour the molten contents into transfer ladles. The office of mixers is to permit the metal which is to be converted into steel in the adjoining building to be mixed so that its quality may be uniform.

On the north and south sides of the building near the top run tracks. Extending between these tracks are two bridges provided with wheels which rest upon the tracks so that the bridges move east and west on the tracks. Upon each bridge is a traveling hoist termed a trolley containing electric motors which run north and south on the bridges. From each of these trolleys are cables for the purpose of lowering and hoisting the ladles and other things. These elevated tracks with the bridges on them and the trolleys on the bridges give the trolleys a universal motion so that they can be moved in any direction. On the south end of each bridge is suspended what is known as the cage, from which the movement of the trolleys north and south and the bridges east and west and the operation of the cables is governed. The entire elevated machinery is moved and operated by electricity and constitutes what are called the cranes. A standard gauge railroad track runs through the building on the main floor passing the mixers at their north end. A similar railroad track comes into the building on the main floor from the east and runs under the south edge of the mixer floor and under the noses of the mixers, the west end being just west of the west mixer. The molten metal is brought to the mixers in ladles from the blast furnaces. These ladles are large cup-shaped vessels holding from 25,000 to 30,000 pounds of metal. They have a spout which is always on the south side of the ladles and are mounted on trucks; the ladles have trunnions on each side of them which always stand east and west. When it is desired to transfer metal to a mixer a ladle filled with the molten metal is brought into the mixer mill on the north track. The craneman in his cage which is suspended from the bridge some twelve or fifteen feet above the nose of the mixer, raises the ladle to its proper height from the truck with the electric crane by cables suspended from the trolleys which are adjusted to the trunnions by hooks, and by means of an auxiliary cable attached to the north side of the ladle near the

bottom the ladle is tipped and its contents are poured into the mixer through the aperture at its north end. When metal is to be transferred from a mixer a transfer ladle is brought into the mixer mill on a truck on the south track. This truck is moved by means of a cable along the center of the track on which it runs. This cable is in two parts: the one which is mostly on top of the floor being the shorter, the other part of which passes under the floor is the longer. It is operated by means of a drum to which it is attached at the east end. The longer cable passing under the floor rises over a sheave and is joined to the shorter part by what is termed a "button" which fastens the ends of both cables and has a hook which fastens on to the truck which carries the transfer ladle. This track which carried the transfer ladles has an up grade from the east mixer to its west end. This cable occasionally breaks and when it is broken the transfer ladle is operated by hand, being pulled by a gang of about thirty men, until the cable is repaired. This repairing is done by the mechanical department under the direction of appellee.

On the day of the accident the cable broke about the middle of the forenoon and word was sent to the mechanical department to repair it. The appellee with the mechanics under him proceeded to put in a new cable. The work was hindered by the passing and repassing of the transfer ladle, pulled by a gang of men, the mechanics having to step aside while the ladle passed. It passed backwards and forwards each way about eight times an hour and was filled from the west mixer only while the repairs were being made. The cable was being repaired directly under the nose of the east mixer, which the evidence shows was the usual and proper place for repairing a cable or attaching the ends of a new cable to the button. The west crane was operated by Joseph Juver, its craneman. When the work of putting in the new cable was nearly finished, the craneman picked up a ladle containing

about 15,000 pounds of metal which had become cooled so that it was crusted over on the top; he raised it up with the crane and started to pour it into the east mixer when the crust broke and the metal rushed out in a large volume into the mixer. Some of the metal was spilled at that end of the mixer and a large amount going into the mixer with a rush, the mixer either became too full or the molten metal in it was so agitated that the metal ran over or splashed out of the nose of the mixer and fell upon the appellee who was engaged in the line of his duty under the nose of this mixer, and very seriously injured him.

Counsel for appellant contend that the splashing of the molten metal over the nose of the mixer was one of the risks appellee assumed when he became assistant master mechanic of appellant, and that appellee contributed to his own injury by not ordering the mill closed down while the cable was being repaired. These are the only legal questions presented by appellant. The negligence averred in the first count is that the appellant carelessly and negligently caused a large quantity of molten metal to escape from the mixer. The evidence shows that appellee had nothing to do with operating the plant or the mixer mill, and that he had no authority over the employes engaged in operating the mixer mill, but whenever appellee thought it necessary that the plant should be shut down while appellee and the mechanics under him were making repairs the plant would be shut down. Appellee never gave orders to Spencer's or Wombacher's men and never got orders from Spencer or Wombacher. It was not an unusual occurrence for this cable to require repairs and it was always repaired under the nose of the east mixer. Appellee had been at work on the cable about two hours and the evidence shows that only the west mixer was used during that time. Wombacher had given orders and had notified Carter, the weighman who attended the scales on the mixer floor, three quarters of an hour before the accident, not to

use the east mixer, but to use the west mixer while the cable was being repaired. Carter had authority to direct Juver, the craneman, and it was the craneman's duty to obey the weighman. The weighman knew the mechanics were repairing the cable under the nose of the east mixer, and the craneman knew the cable was broken. The craneman states that he did not know the mechanics were working under the east mixer, or he would not have poured metal into it, but did know the cable was broken before the appellee was injured. The east mixer was full, the metal came to within fifteen to eighteen inches of the end of the nose of the mixer on the slant. Wombacher and the other foreman and superintendents had been specially directed to be careful when men were working beneath other men. Wombacher had ordered Carter not to use the east mixer and yet Carter permitted Juver to use it.

The craneman, Juver, states that at the time of the accident he had picked up a ladle which was cooled over on top "frozen"; a hole had been punched through the crust; the hole was clogged and he "gave it a little more power" and had poured about half of it when the crust broke and the metal splashed; he then reversed the ladle and not knowing anything had happened moved the ladle over and poured the balance into the west mixer. Charles Schauland, a witness for appellant, and whose duty it was to attend to the oil by which the mixers are heated, and who was at work on the mixer floor, saw the craneman turning a ladle half full of iron that was "frozen over" and shouted to him "to hold on" but the metal broke and went into the mixer and a splash came out of the nose. He testifies that he called to Juver, "because if he tipped it back it wouldn't have busted open," and that when he saw the ladle and saw that the metal did not run out he knew there was something wrong, and that Juver could see the condition of the ladle as well as the witness. A great many witnesses who had been

working about these mixers for from a few months to fifteen years testified that no metal was ever known to have splashed or to have spilled out of the nose before this instance. Juver had been craneman on this crane three weeks before the accident. Three different witnesses testified regarding Juver's incompetency and Wombacher, the superintendent, had heard complaints about him. Spencer, the general superintendent, had heard complaints that this craneman handled the crane roughly.

The risks which appellee assumed were those ordinarily incident to his employment as assistant master mechanic in the department in which he was employed. He did not assume the risk of being burned because of a servant of appellant, who was not a fellow-servant of appellee, negligently pouring a ladle containing metal which had cooled sufficiently to have formed a hard crust on the top into a mixer under which appellee was working. The appellee did not assume the risk of the employes of appellant operating the mixer plant under Wombacher, disobeying Wombacher's orders. "Where a corporation authorizes one of its employes to have the control over a particular class of workmen in any branch of its business such employe is, *quoad hoc,* the direct representative of the company. The commands which he gives, within the scope of his authority, are the commands of the company itself, and if such commands are not unreasonable those under his charge are bound to obey at the peril of losing their situations, hence the company will be held responsible for the consequences." Kennedy v. Swift & Co., 234 Ill. 606; Illinois Steel Co. v. Schymanowski, 162 Ill. 447; Illinois Third Vein Coal Co. v. Cioni, 215 Ill. 583. This rule makes appellant liable for Carter's acts in not seeing that Wombacher's orders that the east mixer should not be used were obeyed.

We cannot say that the jury were not reasonably justified from all the evidence in finding that the over-

flow of the metal was caused by the negligent pouring of a "frozen" ladle of metal into a mixer that was full; that the operating superintendent having ordered that that mixer should not be used while the repairs were being made, the appellee did not contribute to the receipt of the injury; and that the appellee was in the exercise of due care, and that the splashing or overflow of the metal from the mixer was not an assumed risk. There was no error in the trial court refusing to direct a verdict for the defendant.

It is further contended that the damages allowed are excessive. At the time of the accident the appellee was a skilled mechanic, thirty-two years of age, in perfect health and earning $135 per month, with an annual present from his employer of $100 at Christmas. He was so efficient that he had the management of seventy mechanics under him. Since the injury he has not been able to straighten his head, which by the burning of his head, neck and shoulders, is drawn back and to the right at an angle of fifty-five degrees, appellee now having a wry neck so that he looks upwards and to the right constantly. He is unable to lift his right hand as high as his shoulder. He was burned so bad that his life was despaired of for a time. The pain was so great that he was given morphine five weeks. He will not be able to follow his trade as a machinist in the future. When his age, his prospects in life before the injury, his earning capacity, his suffering and the permanent results of the injury are considered, this court is not prepared to say on a review of the evidence that the verdict which has been approved by the trial court is excessive. Finding no error the judgment is affirmed.

*Affirmed.*

Mr. JUSTICE DIBELL took no part in the hearing of this case in this court.